UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

1

METROPOLITAN LIFE INSURANCE
2   COMPANY,

3
                    Plaintiff,
4                                                    CIVIL NO. 97-2331 (DRD)

5                   v.

6   NATIONAL COMMUNICATIONS
    SYSTEMS, INC. d/b/a NATIONAL BENEFIT
7   COMMUNICATION, INC., et al.,

8                   Defendants.

9   _____

10                   **ORDER**

11      On September 29, 1999, Co-defendants, José A. Axtmayer, his wife, and the conjugal

12   partnership they constitute; and Hans H. Hertell, his wife, and the conjugal partnership they

13   constitute ("Co-defendants"), filed a motion requesting the disqualification of the law firm of

14   Goldman Antonetti & Córdova as counsel for Plaintiff. (Docket No. 145).  Thereafter, Plaintiff

15   filed a motion to strike the motion to disqualify and to impose attorneys' fees (Docket No. 171),

16
     as well as an opposition to Co-defendants' disqualification request (Docket No. 205).[1]  In
17

18   essence, Plaintiff's motion to strike and for attorneys' fees argues that Co-defendants' motion

19

20   _____

21      [1]Throughout Plaintiff's opposition Plaintiff incorporates or adopts arguments that were
     presented elsewhere on the record.  See Docket No. 205, § II and § III-B.  In employing this
22   tactic, Plaintiff filed an opposition which facially appears to comply with the Court's
     requirement that motions not exceed twenty five (25) pages in length, see Docket No. 39, p. 3,
23   even though in reality the opposition exceeds fifty (50) pages.  Said practice violates the spirit of
     the standing order.  Notwithstanding, the Court's interest in moving this case along and resolving
24   the motion to disqualify overrides a potential violation of the mandate of the Court's Standing
     Order set forth in the Initial Scheduling Memorandum.  As a final word, the parties are
25   forewarned that the Court shall not tolerate parties playing "fast and loose" and flouting the
     Court's orders.
26

was filed with the primary purpose of continuing to delay adjudication of the merits of Plaintiff's claim and, further, Co-defendants' motion is based to a large extent on a sworn statement which was filed under seal, and thus, cannot be considered by the Court.

Following the First Circuit Court of Appeals' holding in the case of <u>Kevlik v. Goldstein</u>, 724 F.2d 844 (1st Cir. 1984), Plaintiff's motion to strike Co-defendants' motion to disqualify and for attorneys' fees is **DENIED**. (Docket No. 171). Co-defendants' motion to disqualify is **GRANTED**. (Docket No. 145).

Before addressing Co-defendants' motion to disqualify, the Court will tackle Plaintiff's motion to strike and impose attorneys' fees.

## I. Motion to strike

### A. Standing and use of motion for tactical reasons

A motion to disqualify an attorney is an appropriate mechanism for a litigant to bring a potential conflict of interest to a Court's attention. Courts should proceed with caution when faced with motions to disqualify because these allegations are often used for strategic purposes, such as delaying a case or harassing opposing counsel. Further, disqualifying a party's attorney-of-choice is a serious matter which cannot be supported by a mere possibility of conflict. Hence, when faced with a motion to disqualify, courts must balance, on one hand, a client's right to be represented by its chosen attorney against the integrity of the legal system on the other. <u>See</u> <u>Kevlik</u>, 724 F.2d at 850. <u>See also</u> <u>Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc.</u>, 903 F.Supp. 253, 256 (D.P.R. 1995).

In this case Plaintiff correctly advances that counsel for the moving Co-defendants may

AO 72
(Rev 8/82)

rightly seek disqualification of Plaintiff's attorneys even though none of the movants is the allegedly aggrieved client.[2] Kevlik, 724 F.2d at 848.  Nevertheless, Plaintiff counters that Co-defendants' motion is without force and that the sole purpose for filing the motion is to harass Plaintiff and delay the litigation, accordingly, the motion must be struck.  See Richardson-Merrel, Inc. V. Koller, 474 U.S. 424, 436 (1985); Figueroa Olmo v. Westinghouse Electric Corp., 616 F.Supp. 1445, 1450 (D.P.R. 1985); In re American Airlines, Inc., 972 F.2d 605, 610 (5th Cir. 1992);  Capaccione v. Charlotte-Mecklenburg Bd. of Edu., 9 F.Supp.2d 572, 279 (W.D.N.C. 1998).

The Court has examined the record and finds that evidence of a tactical motive behind Co-defendants' motion is absent.[3]  Moreover, Co-defendants' motion – in combination  with the proffered documentary evidence and sworn statements – raises significant issues warranting careful consideration by the Court, particularly given the Court's "duty and responsibility to supervise the conduct of attorneys who appear before it."  Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94, 97  (1st Cir. 1988); see also Fiandaca v. Cunningham, 827 F.2d 825, 828 (1st

---

[2]Rule 8.3(a) of the Rules of Professional Responsibility adopted by the United States District Court for the District of Puerto Rico dictates that "[a] lawyer having personal knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate professional authority."

[3]The record in the instant case is fraught with general, conclusive and repetitive statements of MetLife dramatically portraying the appearing Co-defendants and D'Angelo as acting in bad faith and acting in a retaliatory, frivolous, non-compliant, dilatory and tactical fashion.  The Court forewarns Counsel for MetLife, as the Court has in prior occasions, that accusations of this variety cannot be taken lightly and, in the absence of supporting evidence, may result in imposition of sanctions under Rule 11.  See FED. R. CIV. P. 11. (For an example of the type of accusations and language referred to by the Court see Docket No. 90).

3

Cir.1987); <u>Kevlik</u>, 724 F.2d at 847.  Furthermore, even if Co-defendants' motion was inspired by strategical purposes, the Court refuses to dodge the examination of a potential breach of professional duty simply because the movants may have opted to purposefully delay the litigation by raising the breach at an advanced stage.[4]  <u>See</u> <u>Kevlik</u>, 724 F.2d at 848; <u>Fiandaca</u>, 827 F.2d at 830-831.  On the contrary, "the need for upholding high ethical standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion." <u>Id.</u>  Thus, regardless of whether or not movants acted with the purpose of delaying the instant litigation, the Court cannot shut its eyes to a potential ethical conflict.

### B.    Filing of supporting evidence under seal

As a second basis for its motion to strike, Plaintiff asseverates that Co-defendants' motion is based in substantial part on Co-defendant Axtmayer's sworn statement filed under seal, which statement constitutes an *ex parte* communication in violation of Plaintiff's due process rights.[5]  This argument, however, has been rendered **MOOT**, since after discussing the issue of

---

[4]On its face, Co-defendants' motion introduces the possibility of a significant ethical conflict with MetLife's legal representation.  The fact that Co-defendants may have otherwise delayed this case by failing to fully cooperate in all aspects of discovery does not alter the Court's conclusion (notwithstanding the Court has found that both parties have played "hard ball" with discovery matters patently requiring disclosure); neither does the fact that Co-defendants filed their motion after the allegedly aggrieved party, Co-defendant D'Angelo, had filed a similar motion.  On the contrary, because D'Angelo's motion to disqualify was denied without prejudice for failure to include a proper certification and D'Angelo did not subsequently file another motion to disqualify, the appearing Co-defendants' motion is the only one currently on the record.  <u>See</u> Docket No. 154.

[5]Mr. Axtmayer's statement was filed under seal in order to protect confidential information that although protected was necessary for the Court to determine whether GA&C's disqualification was warranted.  Filing the statement under seal, therefore, served to protect

4

whether or not Axtmayer's statement was an *ex parte* communication and whether Axtmayer's statement was indeed necessary for the Court to reach a decision on the disqualification issue, Plaintiff was supplied with a modified version of Axtmayer's statement and Plaintiff was satisfied.[6]

Having elucidated the rationale for denial of Plaintiff's motion to strike, the Court proceeds to discuss the merits of Co-defendants' motion to disqualify.

## II.   Disqualification of Plaintiff's attorney of choice

The major thrust of Co-defendants' motion to disqualify MetLife's counsel is that Goldman Antonetti & Córdova's (hereinafter "GA&C") predecessor firm, Goldman Antonetti Córdova & Axtmayer (hereinafter "GAC&A"), served as counsel to Co-defendant D'Angelo and

---

privileged communications of CGD Enterprises, Inc. (hereinafter "CGD") and allegedly also protected as to Co-defendant D'Angelo. CGD was a former co-defendant in the original complaint and is wholly owned by its only shareholder and principal corporate executive current co-defendant D'Angelo. The practice of filing under seal further is authorized under relevant jurisprudence. See footnote 12 infra.

[6]On March 1, 2000, the Court instructed Counsel Cuza to provide MetLife with a copy of Axtmayer's modified sworn statement. MetLife was then to inform the Court on or before March 6, 2000, whether said modified statement provided MetLife with sufficient information to oppose Co-defendants' motion to disqualify. Should MetLife have decided on the affirmative, MetLife was to file its opposition to Defendants' motion to disqualify on or before March 21, 2000. On the contrary, should MetLife have been unsatisfied with the modified version, MetLife was to submit a memorandum of law justifying to the Court why MetLife had to have the original version of Axtmayer's statement. (Docket No. 195). The deadlines imposed by the Court for MetLife to object to receiving a modified version of Axtmayer's sworn statement have long expired and MetLife failed to file a memorandum justifying why MetLife should receive an unmodified version of Axtmayer's sworn statement. Further, on March 20, 2000, MetLife did, in fact, file its opposition to Co-defendants' motion to disqualify. (Docket No. 205). Accordingly, the Court determines that MetLife has waived any objections it may have had to receiving a modified version of Axtmayer's sworn statement.

AO 72
(Rev 8/82)

to CGD (a corporation whose agents and/or officers will be key witnesses in the pending suit), before becoming MetLife's counsel.[7] According to Co-defendants, said prior representations introduce a conflict of interest with GA&C's current representation of MetLife based on an actual or potential violation of D'Angelo's and CGD's attorney-client privilege. MetLife, however, questions the existence of an attorney-client relationship with Co-defendant D'Angelo in his individual capacity; as to CGD, GA&C claims that its representation of CGD was not substantially related to the pending suit. Evidence on these questions has been brought to the Court as exhibits to the parties' motions as well as during several discovery hearings, hence, the Court is in position to decide whether or not GA&C should be disqualified as counsel for MetLife.

### A.     Applicable law

Motions to disqualify involve questions of substantive law and, as such, are governed by standards developed under federal law. Federal courts, however, may adopt state or American Bar Association Rules as their ethical standards. Notwithstanding, the interpretation and

---

[7]CGD is a corporation founded by Co-defendant D'Angelo, its president and sole shareholder, in his efforts to establish a benefits communication program in Puerto Rico. In essence, CGD's business consisted of providing public and private employers with software and delivery programs necessary to communicate benefits offered to each company employee. In addition, CGD's business was meant to provide individual employees with an offer to enroll in several insurance products from nationally recognized insurance companies, including MetLife. Thus, CGD's president and agents are potentially key witnesses in this case because of their knowledge and involvement with the 1995 MetLife Agreement which is the object of Plaintiff's Complaint.

application of said rules are to be made under federal law.  In re Snyder, 472 U.S. 634 105 S.Ct. 2874, 2881 n. 6 (1985); American Airlines, 972 F.2d at 609-610.

The District Court of Puerto Rico has adopted the Model Rules of Professional Conduct of the American Bar Association to govern attorneys' conduct and ethical dilemmas which may arise in the practice of law.  See P.R. Loc. R. 211.4(B); see In re Córdova González, 996 F.2d 1334, 1335 n. 1 (1st Cir. 1993).  Hence, the Court examines these rules, specifically Rule 1.10[8], as applicable to the issue at hand; to wit, whether GA&C should be disqualified as counsel for MetLife because of GAC&A's alleged previous representation of Co-defendant D'Angelo and CGD.  The Court acknowledges the presence of significant material controversies of fact surrounding the existence of an attorney-client relationship between Co-defendant D'Angelo and GAC&A.  See Docket Nos. 90, 145, 148, 205, and 212.  Notwithstanding, the Court finds that said controversies do not terminate consideration of Co-defendants' motion to disqualify as neither GA&C nor MetLife challenge the existence of an attorney-client relationship between CGD and GAC&A and, further, there are no controversies of fact concerning the second step of the Court's inquiry regarding that relationship.  Therefore, although the Court cannot at this time determine without holding an evidentiary hearing whether or not there existed an attorney-client relationship between GAC&A and Co-defendant D'Angelo, the Court can determine, and in fact does determine, that an attorney-client relationship existed between CGD and GAC&A and that said relationship requires GA&C's disqualification as counsel for MetLife.

_____

[8]Rule 1.10 seeks to prevent confidential information obtained in a former attorney-client relationship from being used in subsequent litigation by providing for the imputed disqualification of an attorney to all other attorneys in his or her current or prior law firm.  See Starlight Sugar Inc. v. Soto, 903 F.Supp. 261, 265 (D.P.R. 1995); see also Kevlik, 724 F.2d at 850-851.

7

### B.    Discussion

Rule 1.10 mandates that "when a lawyer [Axtmayer] has terminated an association with a firm [GAC&A], the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer unless: (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9 (b) that is material to the matter."

Based on the above-transcribed rule, before determining whether disqualification of a law firm is warranted in a particular situation, the Court must ascertain whether a previous attorney-client relationship existed between a lawyer formerly associated with that law firm and the allegedly aggrieved party. If the response is positive, such as has been proven in the instant case by admission of both Plaintiff and its counsel, see Docket No. 205, at 5; Docket No. 205, Exhibits E and K; Docket No. 90, at 30, the Court must then determine whether the matter of the challenged relationship is the same or substantially related to the matter of the previous relationship and whether any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(b) that is material to the matter. In either case, "the moving party bears the burden" of proving the necessary elements for a disqualification. Starlight, 903 F.Supp. at 266; see Polyagro Plastics, 903 F.Supp. at 256; Díaz Estrada v. López Cabrera, 632 F.Supp. 1174, 1175 (D.P.R. 1986).[9] Further, "both prongs must be met under Model Rule 1.10(b) for the firm to be

---

[9]Although the moving party must allege the type and nature of confidences exchanged in the prior litigation in order to demonstrate the need to disqualify an attorney or law firm from a latter representation, the court will not actually examine the confidential information. To do so would result in the confidentiality of the information being lost in the same process that attempts to protect it. However, a mere allegation that confidential information was revealed in a prior

8

disqualified – a 'substantial relationship' alone between the two matters will not do it."

Thermodyne Food Service Prods., Inc. v. McDonald's Corp., 960 F.Supp. 138, 141 (N.D. Ill.

1997); see Elan Transdermal Ltd. v. Cygnus Therapeutic Systs., 809 F.Supp. 1383, 1391 (N.D.

Cal. 1992); Richard, Jr. v. Southern Pacific Transp. Co., 735 F.Supp. 206, 208 (E.D. La. 1990).


### 1.      *Previous attorney-client relationship*

As stated above, both Plaintiff and GA&C have admitted to the existence of a past

attorney-client relationship between CGD and GAC&A.  See Docket No. 205, at 5 and 11;

Docket No. 205, Exhibits E and K; Docket No. 90, at 30.   Accordingly, the Court need not exert

further energy examining evidence in support of a finding that said relationship existed.  Instead,

the Court proceeds directly to the next step in the disqualification inquiry, that is, whether the

matter covered by GA&C's prior representation of CGD is the same or substantially related to

GA&C's present representation of MetLife.


### 2.      *Matters of previous relationship are substantially related to current representation*

The substantially related test is not so much a rule of substantive law.  Rather, the test is

"a measure of the quantum of evidence required for proof of the professional obligation."

Starlight, 903 F.Supp. at 265.  The relevant inquiry is whether "the subject matter of the two

representations is 'substantially related,'which means: if the lawyer could have obtained

confidential information in the first representation that would have been relevant in the second."

representation will not create an "irrebutable presumption" that confidences were in fact
exchanged nor suffice to warrant disqualification.  Starlight, 903 F.Supp. at 266.

9

Kevlik, 724 F.2d at 851 (citing from Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263, 1266

(7th Cir. 1983)); see also Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 439-440 (1st Cir.

1991).

In applying the "substantially related" test, this district has applied in the past a three-

pronged analysis which the Court deems reasonable and follows:

> First, the court reconstructs the scope of the facts involved in the former
> representation and projects the scope of the facts that will be involved in the second
> representation. Second, the court assumes that the lawyer obtained confidential client
> information about all facts within the scope of the former representation. Third, the
> court determines whether any aspect of the former representation is so similar to any
> material matter in the latter representation that a lawyer would consider it useful in
> advancing the interests of the client in the latter representation.

Starlight, 903 F.Supp. at 265-266; see also Díaz Estrada, 632 F.Supp. at 1176.

Co-defendants argue that the matters included in GA&C's current representation of

MetLife are "substantially related" to GAC&A's prior representation of CGD because the scope

of the CGD relationship "related to the analysis of the validity, legality, implementation and

genesis of the insurance benefits program that was ultimately set up in Puerto Rico and which is

at the heart of this case." Docket No. 145 at 15-16. In support of this contention, Co-defendants

set forth that the Complaint originally filed by GA&C on behalf of MetLife avers that at all

relevant times CGD "was involved in the contract and the transactions relevant to this

complaint." Docket No. 1 at ¶¶ 4 and 44. Further, Co-defendants assert that earlier during this

litigation MetLife served a request for document production on Co-defendant Axtmayer wherein

MetLife requested documents and information directly pertaining to the attorney-client

relationship that existed in 1993 and 1994 between GAC&A and CGD. Docket No. 145, Exhibit

P. Thus, according to Co-defendants, MetLife's own conduct before the Court supports a finding

AO 72
(Rev 8/82)

that GAC&A's prior relationship with CGD is substantially related to GA&C's current

representation of MetLife in this case.

In response to Co-defendants' arguments, MetLife asserts that GA&C's representation of

MetLife involves a matter completely unrelated to GAC&A's representation of CGD.[10] MetLife

argues that GAC&A represented CGD in a series of contractual transactions involving Boston

Mutual Insurance Company, Capital American Life Insurance Company, and the Treasury

Department of the Commonwealth of Puerto Rico; and that these transactions had nothing to do

and failed long before the 1995 MetLife agreement under scrutiny in this case. Docket No. 90 at

37, Docket No. 205 at 13. Further, MetLife advances that the 1995 MetLife agreement was the

result of efforts undertaken, amongst others, by Co-defendant D'Angelo in his personal capacity,

not as president and sole shareholder of CGD. Docket No. 90 at 5-6. MetLife does not

controvert Co-defendants' evidence in order to explain CGD's involvement in this case and the

potential conflicts of interests that arise out of CGD's agent's and/or executive's role as a

principal witness.[11] Additionally, MetLife fails to address the fact that CGD was initially

included as a Co-defendant in this case, Docket No. 1, thus suggesting that CGD was somehow

involved in the 1995 MetLife agreement; that MetLife designated CGD as broker for its program;

---

[10]MetLife makes the following statement in support of its assertion: While in 1993 GAC&A, through Axtmayer and other non-GA&C attorneys, assisted CGD in the Boston Mutual/Treasury Ventures, these contractual transactions have absolutely nothing to do with the 1995 MetLife Agreement under scrutiny in this action. **Indeed, every single fact associated with this litigation took place sometime after early 1995,** when the Partners agreed upon their Partnership, Hertell and Axtmayer obtained the 1995 Government Ventures, and the 1995 MetLife Agreement was entered. Docket No. 205 at 13 (emphasis in original).

[11]Although the moving Co-defendants have the burden in this case, once they have set forth sufficient evidence to support a finding of conflict of interest, Plaintiff must offer evidence to controvert that offered by Co-defendants.

11

AO 72
(Rev 8/82)

Docket No. 145, Exhibit J; and that CGD was perceived both by MetLife and its potential clients as undifferentiated or under the control of Co-defendants National Benefits Communications and Benefit Communication Corporation, Docket No. 145, Exhibits K and L; Docket No. 148, ¶ 10. Finally, MetLife fails to address Mr. Axtmayer's contention that on or about the summer of 1995 Mr. D'Angelo and Co-defendant George Miller traveled to Puerto Rico with MetLife officers in order to introduce MetLife to potential clients and to ascertain the viability of utilizing the "MetLife Metromatic Whole Life Insurance" in conjunction with CGD's benefits communication program. Docket No. 148, ¶ 9. This visit, although admittedly after CGD had terminated its attorney-client relationship with GAC&A, appears to the Court as one of many steps in CGD's efforts to establish the program that was the object of its representation by GAC&A, thus lending further support to the conclusion that the 1995 MetLife agreement is substantially related to GAC&A's representation of CGD. Undoubtedly, during said representation CGD must have communicated substantial amounts of confidential information relevant to the benefits communication program being developed and through that exchange of confidences "a lawyer could have obtained confidential information in the first representation that would have been relevant in the second." Kevlik, 724 F.2d at 851 (citations omitted).[12]

_____

[12]In the "substantial relation" portion of the disqualification analysis, courts attempt to avoid placing the former client in the position of revealing the confidences divulged to his attorney. For this reason, when faced with an explicit or uncontested attorney-client relationship, courts simply assume that confidences have been passed as part of the attorney-client relationship. See Polyagro, 903 F.Supp. 253, 257 (D.P.R. 1995); see also Starlight, 903 F.Supp. at 266. Because such is the case here, the Court exercises caution to maintain CGD's confidences undisclosed and allows Co-defendants to meet their burden by delineating, as they have done, the subject matters and issues present in each of the attorney-client relationships in controversy. Because Co-defendants have met this requirement, the Court has assumed that confidences within the scope of the GAC&A-CGD relationship were in fact exchanged. See reference to footnote 5 infra.

12

In conclusion, the Court holds that the scope of GAC&A's prior representation of CGD is substantially related as required under Kevlik, 724 F.2d at 851. Further, the Court may indulge in a reasonable presumption that during GAC&A's representation of CGD, GAC&A obtained confidential information related to the subject matter of GA&C's current representation of MetLife. See La Salle Nat'l Bank v. County of Lake, 703 F.2d 252, 255 (7th Cir. 1983); Díaz Estrada, 632 F.Supp. at 1176. And finally, the Court finds that said confidences are material to Plaintiff's claim in the instant case as can be corroborated by the allegations made against CGD in the original Complaint.

3.    *Access to protected information*

The final step in the disqualification analysis under Rule 1.10(b) requires the Court to determine whether any attorney remaining at GA&C has accessed information from GAC&A's prior representation of CGD, whether said information protected by Rule 1.6 (confidentiality of interest) and Rule 1.9(c) (conflict of interest); and whether said information is material to GA&C's current representation of MetLife. In this context, Co-defendants carry the burden of demonstrating: (1) that protected information was shared with an attorney who still remains in the firm whose disqualification is sought; and (2) the information is material to the litigation in which disqualification is sought. See Rule 1.10(b).

Co-defendants attempt to fulfill their burden by submitting Mr. Axtmayer's sworn statement that several of GA&C's current partners, including Vicente J. Antonetti, Luis F. Antonetti, Edwin Seda and Mercedes Barrera, were made privy to confidential information regarding the CGD benefits communication program while Mr. Axtmayer was still a partner at

13

GAC&A. Docket No. 148, ¶ 7.[13]  Additionally, Co-defendants present Mr. Axtmayer's

unopposed sworn statement that GA&C retained the CGD file after Mr. Axtmayer had left the

firm, id. at ¶ 11, and that GA&C also retained Mr. Axtmayer's personal reading files and did not

return them after such files had been "expurgated" of all documents and materials relating to

GACA's prior representation of CGD.  Id. at ¶ 12.  These declarations, therefore, suffice to find

that confidential information on the CGD matter was obtained by attorneys who remain with

GA&C and that said confidential information is material to the case at hand.[14]


**III.    Conclusion**

    Although GA&C refuses to acknowledge of a conflict of interest in its representation of

MetLife, the Court finds that GAC&A's prior representation of CGD raises a potential conflict

due to GA&C's current attorneys' actual or potential misuse of confidential information obtained

from CGD or potential inability to fully cross-examine for fear of misusing confidential

information.  See Kevlik, 724 F.2d at 850; U.S. v Shepard, 675 F.2d 977, 979 (8th Cir. 1982).

---

[13]On this point, Plaintiff has simply referred the Court to a sworn statement by counsel Vicente Antonetti.  Docket No. 205 at n. 7.  Plaintiff, however, has not provided a statement by the remaining attorneys allegedly made privy to confidences by Mr. Axtmayer.  Therefore, although there is a controversy involving Mr. Vicente Antonetti's access to CGD's confidences, there is no controversy as to the remaining attorneys as stated under oath by Mr. Axtmayer.

[14]Although Plaintiff cites the case of Unysis Corp. v. Amperif Corp., 1992 WL 210243 (E.D.Pa. 1992) for the proposition that general access to a former client's file is not enough to warrant disqualification, Plaintiff fails to address Co-defendants' contention that GA&C carefully studied the contents of the CGD file before filing the state court suit for collection of money for professional legal services rendered against former client CGD and before filing the original Complaint in the instant action against CGD.  Docket No. 212, at 7-8.  On the basis of MetLife and/or GA&C's silence, the Court concludes that Co-defendants are correct in asserting that attorneys at GA&C carefully scrutinized CGD's file.

AO 72
(Rev 8/82)

Wherefore, the inescapable conclusion after due consideration of the competing interests present in this case is that GA&C must be disqualified as counsel for MetLife.[15]

**IT IS SO ORDERED.**

**DATE: August 15, 2000**

P:\KAREN\97-2331 DSQ

**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**

---

[15]The Court is well-aware of the burdens and repercussions of this decision for Plaintiff, all options have been evaluated; the decision finally reached follows an analysis of the case's peculiar factual scenario. See NFC, Inc. v. General Nutrition, Inc., 562 F.Supp. 332 (D.Ma. 1983) (courts should use less drastic alternative to disqualification if alternative will preserve the ethical standards of the profession and the public's perception thereof), In re Bushkin Assoc., Inc., 864 F.2d 241, 246 (1st Cir. 1989) (decision to disqualify turns on the peculiar factual situation of the case at hand). Indeed, the Court made significant efforts to protect MetLife's free choice of counsel, Díaz Estrada, 632 F.Supp. at 1175-1176, and, further, the Court also entertained the alternative of allowing Mr. Cuza's representation of MetLife under the condition that all matters of the case be screened from all GA&C personnel with access to information related to CGD's representation by GAC&A. However, allowing Mr. Cuza to continue as counsel for MetLife was not a viable option given Mr. Cuza's access to the CGD file during this litigation. See also Kevlik, 724 F.2d at 850 (in a civil case, where the Sixth Amendment's right to counsel is not concerned, the First Circuit leans towards the protection of confidential communications unless there has been an express waiver by the holder of the attorney-client privilege).

15